## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JASON M. EDWARDS,**

**Plaintiff,**

v.                                                    **Civil Action No. 05-0426  (JDB)**

**U.S. ENVIRONMENTAL PROTECTION AGENCY,**

**Defendant.**

## MEMORANDUM OPINION

Plaintiff Jason M. Edwards brings this employment-discrimination suit against defendant the United States Environmental Protection Agency ("defendant," "EPA," or "Agency"). Edwards, who is Native American and African American, alleges that EPA violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by discriminating against him on the basis of race, retaliating against him, and subjecting him to a hostile work environment, and also discriminated against him on the basis of disability in violation of the Rehabilitation Act, 29 U.S.C. § 791 et seq.,[1] by denying his requests for reasonable accommodation.  Presently before the Court is defendant's motion for summary judgment.  For the reasons set forth below, the Court will grant the motion and enter judgment in defendant's favor.

---

[1] Although plaintiff attempts to bring his claim of disability discrimination under Title VII and does not cite to the Rehabilitation Act anywhere in his Complaint, defendant has construed the allegations as arising under the latter statute, and the Court will do the same.

## BACKGROUND

The pertinent facts, which are largely undisputed,[2] chronicle plaintiff's tumultuous

relationship with his supervisor in the National Center for Environmental Research ("NCER"), an

office within EPA's Office of Research and Development ("ORD").  Plaintiff, who identifies

himself as Native American and African American, suffers from a variety of medical ailments.

Compl. at 2, ¶ 3.  Specifically, he remains partially paralyzed from a stroke that he suffered prior

to working at EPA, and also suffers from Crohn's disease/colitis, "a malady of the small intestine

that can cause periodic episodes of obstruction and acute abdominal pain,"  United States v.

Martin, 363 F.3d 25, 49 (1st Cir. 2004), and that is exacerbated by stress and fatigue.  Compl. at

11, ¶ 16; Def.'s Exh. 11 (Sept. 18, 2001 Mem. to Clark).  In addition to the limitations on his

mobility caused by the paralysis, he claims that his intestinal disorder - - and the accompanying

medication - - has led to bursitis, arthritis, joint pain, and diminished eyesight.  Id.

Plaintiff worked as a Program Analyst in the Environmental Sciences Research Division

("ESRD") of NCER.  Def.'s Stmt. at 4, ¶¶ 1-3.  In that position, he managed research grant and

fellowship programs, conducted occasional site visits, and served for a period as Special

Emphasis Project Manager and Tribal Program Coordinator.  Compl. at 5-6, ¶ 14; Pl.'s Exh. 8 at

249 (First Record of Investigation).  His supervisor early in his tenure at EPA was David

Kleffman.  Def.'s Stmt. at 4, ¶ 5.  According to plaintiff, Kleffman allowed him to work from

---

[2] These facts are drawn primarily from defendant's Statement of Material Facts Not in Genuine Dispute ("Def.'s Stmt.") and the exhibits cited therein.  Plaintiff has filed a Counter Statement of Material Facts Genuinely in Dispute ("Pl.'s Stmt.").  That document, however, repeats the content of defendant's Statement, purports to admit or deny the facts as presented by defendant, and, when contesting in whole or part the defendant's version of events, simply adds supplemental details or commentary favorable to plaintiff.  E.g., Pl.'s Stmt. at 15, ¶ 36.

home when weather conditions made it difficult for him to commute to work.  Def.'s Exh. 17 at

138 (Edwards 2005 Depo.); Def.'s Exh. 38 at 3, ¶ 15 (Levinson Decl.).  Kleffman's successor,

Barbara Levinson, continued this informal arrangement, though the practice was never

memorialized in writing.  Def.'s Exh. 17 at 138; Def.'s Exh. 38 at 3, ¶ 15.

     While Kleffman was still his supervisor, plaintiff filed his first EEO complaint with

EPA's Office of Civil Rights in March of 1999.  Plaintiff alleged that Kleffman had retaliated

against him by refusing to promote him to GS-9 and refusing to convert him from non-

competitive status to full-time, competitive status, which would have allowed him further career

advancement.  Def.'s Ex. 5 at 2-3.  This complaint was resolved by a settlement agreement in

June 2001, in which EPA agreed, among other things, to pay plaintiff a designated amount and to

consider him for a promotion to GS-11.  See Def's Stmt. at 5 n.2.

     Rebecca Clark became Acting Director of ESRD, and plaintiff's supervisor, shortly after

the settlement agreement had been signed.  Def.'s Stmt. at 4, ¶ 4.  She had an introductory

meeting with plaintiff on July 31, 2001.  Compl. at 14, ¶ 14.  During the meeting, which he

described as "cordial," Def.'s Exh. 17 at 71, plaintiff informed Clark about the settlement

agreement and his expectation that he would be transferred out of NCER in the near future.

Def.'s Stmt. at 9, ¶ 31; Pl.'s Exh. 8 at 249.  Plaintiff expressed his willingness "to pull [his] own

weight" while still in the division, but "made it clear" to Clark that his "first priority was to

secure . . . employment elsewhere."  Def.'s Exh. 17 at 72; Def.'s Exh. 3 at 124 (Clark 2005

Depo.).  Clark captured these representations in her handwritten notes from the meeting, where

she indicated, among other things, plaintiff's desire to relocate to Ohio, his "reluctance" to be

assigned "new tasks," his willingness to provide "some help with other things," and that he had

3

an economics degree.  Pl.'s Exh. 8 at 249.  After this "cordial" introductory meeting, however,

plaintiff's relationship with Clark deteriorated rapidly, leading to the series of events that

comprise the basis for this lawsuit.  Those events can be divided into three categories: (1)

plaintiff's workload and opportunity for training; (2) the Agency's alleged failure to provide

plaintiff with reasonable accommodations for his disability; and (3) a number of actions that

Clark allegedly took in retaliation for plaintiff's filing of an EEO complaint.

**1. Work and Training Opportunities under Clark**

Plaintiff alleges in his complaint that his duties were reduced after he filed his first EEO

complaint in the spring of 1999.  Between that time and his transfer in 2003, he says, no major

projects were assigned to him, and his workload dropped by 60%.  Compl. at 4-5.  In addition,

supervisors prevented him from conducting unsupervised site visits and stripped him of his

responsibilities as Tribal Program Coordinator and Special Emphasis Project Manager in July

and September 2000, respectively.  Id.  Although acknowledging that this reduction in

responsibilities took place before Clark's tenure as Acting Division Director, plaintiff insists that

the trend persisted under Clark's leadership in so far as the management of new grant recipients

continued to be assigned to others.  Pl.'s Stmt. at 14.

Clark did, however, assign plaintiff a task outside the scope of his other day-to-day

duties.  Seizing on plaintiff's background in economics, Clark called several colleagues,

including her husband, Dr. Matthew Clark, to ask whether they had any economics-related work

that plaintiff could perform.  Def.'s Exh. 3 at 124-25.  Dr. Clark, an economist in another division

of EPA, agreed to provide an assignment.  He asked plaintiff in late July 2001 to conduct a

literature search in connection with a report being prepared by his office.  Def.'s Exh. 19 at 24-25

(Dr. Clark 2004 Depo.); Def.'s Exh. 3 at 138-39.

On Sunday, October 21, 2001, plaintiff sent Clark an e-mail message informing her that

his grandfather had passed away and that he would be missing work to attend the funeral in

Cleveland.  Def.'s Exh. 21 (Oct. 21, 2001 E-mail to Clark).  That same evening, he left a draft of

the assigned literature search on the chair of Dr. Clark, purportedly with a note in which he told

Dr. Clark that he would be leaving for a funeral and asked to discuss his work product upon his

return.  Compl. at 9; Pl.'s Exh. 2 at 84-85 (Edwards 2006 Depo.).  The draft consisted of what Dr.

Clark described as "a printout of a single online search that may have taken 15 minutes or half an

hour."  Pl.'s Exh. 4 at 37.  Dr. Clark then reported to his wife that the work performed by plaintiff

"was not adequate."  Def.'s Exh. 3 at 128.

During the period when he was supposedly working on the bibliography for Dr. Clark,

plaintiff also sought out multiple offsite training opportunities.  Def.'s Stmt. at 8, ¶ 25.  In

September 2001, for instance, Rebecca Clark authorized plaintiff to attend Applied Clear Air Act

training in South Carolina.  See id.; Def.'s Exh. 17 at 92.  Plaintiff later sought permission - - first

verbally and then in writing - - to attend an American Indian Science and Engineering Society

(AISES) conference that was to be held Albuquerque, New Mexico in November 2001.  Def.'s

Stmt. at 8, ¶ 26; Def.'s Exh. 18.  In plaintiff's view, attending the AISES conference was

important to his "efforts to secure other employment" because the conference included a "fairly

large career fair" that featured recruiters from both government agencies and the private sector.

Def.'s Exh. 17 at 98-99.  Clark did not permit plaintiff to attend the conference.  Def.'s Stmt. at 9,

¶ 28.  Between August 1, 2001 and April 30, 2002, she also declined to authorize out-of-town

training for nine other employees, two of whom were African American.  Def.'s Exh. 20 (Denied

Requests for Training and/or Travel).

## 2.  EPA's Alleged Failure to Accommodate

In August 2001, plaintiff verbally requested permission to bring his 10-week-old puppy to the office.  Plaintiff told Clark that his doctor had recommended that he bring the dog to work to ameliorate work-related stress.  Def.'s Stmt. at 5, ¶ 12.  Clark had discussions with other EPA personnel and with plaintiff, eventually inquiring whether the dog had been trained or had been certified as a service animal.  Def.'s Exh. 10 (Timeline of Events).  She then requested that plaintiff submit medical documentation and information on the dog's training.  See id.  Plaintiff responded by submitting a memorandum detailing his medical condition and a note from his doctor, Kevin Geraci.  Def.'s Stmt. at 6, ¶¶ 13-14.  Geraci disclaimed expertise on the concrete benefits that the dog could confer, emphasizing that "[t]he need for the dog is beyond the realm of [his] discussion here," but also expressed support for what he described "as a holistic and experimental approach."  Def.'s Exh. 15 (Nov. 16, 2001 Mem.); Pl.'s Stmt. at 5-6.  Dr. Geraci concluded, "I would say 'go for it!'  It certainly cannot hurt."  Id.  After a second verbal request on November 2, 2001, plaintiff formally requested that the Agency make a final decision.  Def.'s Exh. 14 (Nov. 14, 2001. Mem. to Clark).  Clark then officially rejected the request, explaining that the nature of plaintiff's medical condition, which she understood as "anxiety about commuting to work and interacting with [] coworkers," did "not relate to any mobility, hearing, visual or other impairments which require use of a service animal."  Def.'s Exh. 15.  Clark thus concluded that Dr. Geraci's "perspective on [plaintiff's] use of a service animal was not based on an articulated medical need."  Id.

Plaintiff also maintains that Clark revoked the prior arrangement under which he could

work from home when his disabilities made it difficult for him to commute to the office.  Compl. at 11, ¶ 16; Def.'s Exh. 17 at 138.  Plaintiff's previous supervisors had never required him to seek formal approval for this arrangement, in part because plaintiff "worked from home only infrequently and then usually for only a portion of the day."  Def.'s Exh. 38 at 3, ¶ 15.  Clark asked Levinson, her immediate predecessor as the Acting Director of ESRD, whether plaintiff was eligible to work from home.  Levinson told Clark that, to the best of her knowledge, plaintiff "had not submitted a formal request or been granted official authorization to work from home." Id. at 3, ¶ 16.  A review of plaintiff's personnel records confirmed that account.  Def.'s Stmt. at 8, ¶ 24.  Clark then told plaintiff that, if he wanted authorization to work from home, he would have to submit a formal request in accordance with EPA's "Flexiplace" regulations.  Id.; Def.'s Exh. 41 (EPA Flexiplace Policy).  Plaintiff never did so.  Def.'s Stmt. at 8, ¶ 24.

### 3.  Alleged Retaliatory Acts

Following Clark's refusal to authorize both the trip to the AISES conference and the request to bring a dog to the office, plaintiff filed an EEO complaint against her on November 28, 2001.  Compl. at 11, ¶ 16.  Clark first learned of the complaint when she was contacted by an EEO counselor on December 5, 2001.  Id.; Def.'s Stmt. at 9, ¶ 30.  On the day that he filed the complaint, plaintiff was supposed to be at NCER's two-day offsite retreat.  Employees had been advised at a staff meeting on November 15 that attendance at the retreat was mandatory, and a flyer distributed to them via e-mail said: "Everyone is expected."  Def.'s Exh. 24 at 176 (Clark 2002 EEO Interview); Def.'s Exh. 23 (Email with Flyer Attachment).  When plaintiff did not show up on November 27, Clark returned to the office and left a note on his chair explaining that he was expected to be at the retreat and asking him why he was not there.  Def.'s Exh. 24 at 176

7

(Clark 2002 EEO Interview).  Plaintiff received the note but did not come to the retreat either that day or the next.  Def.'s Stmt. at 11, ¶ 40; Def.'s Exh. 17 at 189.

Further confrontations between plaintiff and Clark followed.  On December 13, 2001, Clark issued plaintiff an official reprimand for his absence from the offsite retreat.  Def.'s Stmt. at 11, ¶ 42; Def.'s Exh. 26 (Letter of Reprimand).  Four days later, in accordance with the settlement agreement, Clark conducted a performance review with plaintiff in order to determine whether he should be promoted to GS-11.  Def.'s Stmt. at 17, ¶ 74.  Clark had previously consulted with Barbara Levinson, plaintiff's supervisor during the first half of the year, regarding plaintiff's performance.  Def.'s Exh. 38 at 3, ¶ 17.  On December 17, Clark informed plaintiff that she would not recommend him for a promotion.  Def.'s Exh. 24 at 179.  After receiving plaintiff's written objections to the grounds that she had provided, Clark responded with documents that detailed the inadequacies in plaintiff's performance throughout the course of the year.  Def.'s Exh. 28 (Plaintiff's Objections); Def.'s Exh. 40 (Clark's Dec. 19, 2001 Mem. to Plaintiff).

Plaintiff's attendance problems continued in early 2002.  On January 28, he called the ESRD secretary, rather than Clark, to report that he would be out sick that day.  Def.'s Stmt. at 12, ¶ 46.  Clark had previously informed ESRD employees that they had to contact her directly when requesting leave.  Def.'s Stmt. at 43; Def.'s Exh. 27 (Sept. 7, 2001 E-mail to Staff).  The following day, Clark issued a memorandum charging plaintiff with being absent without leave (AWOL), a period of leave without pay.  Def.'s Exh. 29 (January 29, 2002 Mem.).  Her memorandum noted that she had previously warned plaintiff, in an e-mail message dated November 9, 2001, that further failures to comply with the leave policy would result in AWOL status.  Id.; see Def.'s Exh. 27 at 243 (E-mail of Nov. 9, 2001).

In early March, plaintiff failed to attend large segments of the Quality Assurance Training that the Agency deemed mandatory. Def.'s Stmt. at 13, ¶¶ 49-55. Plaintiff had been advised of his obligation to attend the training in a series of e-mail messages, as well as at a staff meeting that he attended on March 7, 2002 (though plaintiff denies that he was so informed at the staff meeting). Id. at 14, ¶ 49; Def.'s Exh. 30 at 276-287 (E-mail exchanges); Def.'s Exh. 31 at 2 (Clark 2002 EEO Interview). He arrived late on March 11, 2002, the first day of training, did not attend the second day of training, and again arrived late on the third day because he was meeting with Jack Puzak, NCER's Deputy Director, to complain about Clark's supervision. Def.'s Stmt. at 14, ¶ 55; Def.'s Exh. 30 at 291 (March 14, 2002 E-mail from Edwards to Clark). Clark responded by proposing that plaintiff be suspended for five days. Def.'s Exh. 7 (May 28, 2002 Notice of Proposed Suspension). NCER Director Peter Preuss approved Clark's recommendation, over plaintiff's objections, on August 5, 2002. Def.'s Exh. 33.

Plaintiff returned to ESRD in January 2003 after a one-month detail in the Office of the Inspector. Def.'s Stmt. at 15, ¶ 62. Clark then told plaintiff that he would be required to submit a weekly report detailing his activities and projects. Id. at 15, ¶ 63; Def.'s Exh. 17 at 268-69. Plaintiff failed to turn in the first weekly report, which was due on Friday, February 14, 2003. Def.'s Stmt. at 15, ¶ 65. Clark sent him a reminder that afternoon, and did so once again two weeks later when plaintiff still had not turned in a single report. Id. at 15, ¶¶ 65-66. Plaintiff explained to Clark during a meeting on March 5, 2003 that he had not completed any reports because he had nothing to say, he believed that Clark had imposed the report requirement only on him, and he was spending his time looking for a job outside of NCER (which he viewed as his highest priority). Def.'s Exh. 9 (May 12, 2003 Notice of Proposed Suspension). After consulting

9

with the Office of Human Resources and her supervisors, Clark proposed that plaintiff be suspended for ten days.  Id.; Def.'s Stmt. at 16, ¶ 70.  Jack Puzak approved the suspension on July 1, 2003.  Id. at 16, ¶ 72; Def.'s Exh. 36 (Decision on Proposed Suspension).

In response to the ten-day suspension, plaintiff filed a second EEO complaint in August 2003.  Def.'s Stmt. at 4 n.1.  His two complaints were later consolidated in December 2004. Compl. at 3, ¶ 9.  Plaintiff filed the instant suit when 180 days had passed since his request for a hearing before the Equal Employment Opportunity Commission.  See 29 C.F.R. § 1614.407.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, 'which it believes demonstrate the absence of a genuine issue of material fact.'" Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the

10

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer

"evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.


## DISCUSSION

Plaintiff alleges in his one-count complaint that defendant EPA discriminated against him

on the basis of race, retaliated against him for filing an EEO complaint, and denied him

reasonable accommodations for his disabilities.  EPA asserts that plaintiff has failed to make out

a prima facie case on any of his allegations and that, even if he has, the Agency has proffered

legitimate, nondiscriminatory reasons for its actions.  The Court will address plaintiff's

allegations in turn, beginning with the claims under Title VII.

## I.  Title VII

### A.  Legal framework

Disparate treatment and retaliation claims brought pursuant to Title VII are analyzed

under the familiar burden-shifting framework established by the Supreme Court in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  The first step in the framework requires a plaintiff

to carry the burden of establishing a prima facie case by a preponderance of the evidence.

McDonnell Douglas, 411 U.S. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

252-53 (1981).  In order to make out a prima facie case of discrimination, a plaintiff must show

that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)). The elements of a prima facie case for retaliation require that plaintiff establish: "(1) that she engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brody, 199 F.3d at 452. Under the Supreme Court's recent decision in Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination. See also Velikonja v. Gonzales, - - F.3d - - , No. 05-5030, Slip Op. at 3 (D.C. Cir. Oct. 17, 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's burden, however, is merely one of production. Burdine, 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered

explanation is unworthy of credence.'"  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that

the defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.  Thus, the

trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and

inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is

pretextual.'"  Id. (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law

is appropriate in any particular case will depend on a number of factors . . . includ[ing] the

strength of the plaintiff's prima facie case, the probative value of the proof that the employer's

explanation is false, and any other evidence that supports the employer's case and that properly

may be considered on a motion for judgment as a matter of law."  Reeves, 530 U.S. at 148-49.

As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from
> the combination of (1) the plaintiff's prima facie case; (2) any evidence the
> plaintiff presents to attack the employer's proffered explanation for its actions;
> and (3) any further evidence of discrimination that may be available to the
> plaintiff (such as independent evidence of discriminatory statements or attitudes
> on the part of the employer) or any contrary evidence that may be available to the
> employer (such as evidence of a strong track record in equal opportunity
> employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the

McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

13

Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination.  At this point, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is discrimination vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination), and any properly considered evidence supporting the employer's case.  Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

A different standard applies to plaintiff's claim that he was subjected to a hostile work environment.  "The workplace is 'hostile' for purposes of Title VII (and thus the Rehabilitation Act) only when the offensive conduct 'permeates [the workplace] with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Bell v. Gonzales, 398 F. Supp. 2d 78, 91 (D.D.C. 2005) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (in turn quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))).  In deciding whether the plaintiff has met this threshold requirement, the Court must examine all of the

circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Harris, 510 U.S. at 23 (internal quotation marks omitted)).

### B.  Disparate treatment

Plaintiff's sole allegation of race-based discrimination stems from Clark's refusal to authorize him to attend the AISES conference in November 2001.  Defendant concedes that Clark refused to authorize the trip and that, as a Native American, plaintiff has established the first element of the prima facie case under McDonnell Douglas.  The parties dispute, however, whether the denial of a single networking opportunity constitutes an adverse employment action and whether, even if it does, plaintiff has offered competent proof to rebut the nondiscriminatory reason offered by EPA.

Plaintiff directs the Court to the D.C. Circuit's decision in Taylor v. F.D.I.C., 132 F.3d 753, 765 (D.C. Cir. 1997).  According to plaintiff, the court of appeals in Taylor "held" that the "denial of training opportunities may rise to the level of an adverse action, if the plaintiff can show that the employer treated him differently from other similarly-situated employees."  Pl.'s Opp'n at 8.  Pointing to a group of African-American employees who were permitted to attend the Blacks in Government Conference in Los Angeles, plaintiff argues that he was treated differently from other similarly situated minority employees.  But as defendant correctly counters, the court of appeals in Taylor did not announce the rule that plaintiff attempts to extract from that case.  Rather, the court merely assumed that "exclusion from . . . one seminar amounted to such a denial of training opportunities as to represent an adverse action," but did not need to

15

decide the question definitively because the plaintiff had not shown "how his treatment differed from that of similarly-situated employees." Taylor, 132 F.3d at 765.

The greater weight of authority suggests that the denial of a single training or travel opportunity does not constitute an adverse employment action unless the plaintiff can "tie the alleged discriminatory employment action to some actual, tangible adverse employment consequence." Nurriddin v. Goldin, 382 F. Supp. 2d 79, 102 (D.D.C. 2005); see also Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000) (reading Ninth Circuit case law as establishing that an employee who "was excluded from meetings, seminars and positions that would have made her eligible for salary increases" had suffered an adverse employment action) (citing Strother v. Southern California Permanente Medical Group, 79 F.3d 859, 869 (9th Cir.1996)).  In Nurriddin, for example, the plaintiff alleged that the defendant discriminated against him by refusing to fund his trip to the Conference of Engineering Deans of Historically Black Colleges and Universities. Id. at 101.  The plaintiff in that case, like the one here, emphasized "the fact that others were permitted to travel while he was not." Id. at 102.  This Court concluded that the plaintiff had failed to offer competent proof from which a jury could infer that he had "suffered objectively tangible harm." Id. (quoting Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)). That conclusion is in accord with both an unpublished opinion from the D.C. Circuit and a substantial body of authority from across the country.  See Campbell v. Nat'l Educ. Ass'n, No. 99-7122, 2000 WL 1584589, at *4 (D.C. Cir. Oct. 3, 2000) (unpublished) (holding that the defendant's "denial of projects and/or conferences that seemed attractive to" the plaintiffs did not constitute an adverse employment action); Jacob-Mua v. Veneman, 289 F.3d 517, 522 (8th Cir. 2002) (finding no adverse employment action where the employer denied the employee

permission to attend a writing workshop); <u>Von Gunten v. Maryland</u>, 243 F.3d 858, 869 (4th Cir. 2001) (finding no adverse employment action where the plaintiff's supervisor "often turned down her requests to attend seminars," even though he had previously approved similar requests); <u>Harper v. City of Jackson</u>, 414 F. Supp. 2d 595, 605 (S.D. Miss. 2005) (finding no adverse employment action where the employer denied the employee's request to take a work-related trip to Atlanta, and collecting cases); <u>Schamann v. O'Keefe</u>, 314 F. Supp. 2d 515, 522 (D. Md. 2004) (concluding that the employer's "denial of funding for a non-essential conference plainly does not materially affect the terms, conditions and benefits of Schamann's employment and does not, therefore, constitute an adverse employment action").

There is, however, one aspect of this case that, plaintiff contends, differentiates it from the authorities cited above. Specifically, plaintiff alleges that the principal benefit of attending the AISES conference was "to network with professionals of Native American descent," thus increasing his opportunity to secure employment outside of NCER. Pl.'s Opp'n at 8; Def.'s Exh. 17 at 98-99. The D.C. Circuit in <u>Brody</u>, when refining the contours of the adverse-employment-action category in the context of lateral transfers, included within that category employment decisions that carry with them "materially adverse consequences affecting the terms, conditions, or privileges of [one]'s employment <u>or [one's] future employment opportunities</u> . . . ." 199 F.3d at 457 (emphasis added). Because missing the AISES conference deprived plaintiff of the chance to seek out a "future employment opportunity" in the form of a new job, the argument goes, a reasonable jury could infer that he suffered objectively tangible harm under <u>Brody</u>.

The principal weakness in plaintiff's argument is that the "materially adverse consequences" that he alleges are purely speculative. There was no guarantee that attending the

conference - - and making the sought-after connections - - would in fact have hastened plaintiff's departure from NCER and have led to concrete "future employment opportunities."  To accept plaintiff's argument, therefore, the Court would have to conclude that any constraint on the opportunity to seek out other employment opportunities is itself an adverse employment action.  Such a holding would constitute a truly expansive reading of what the Brody court had in mind when it used the phrase "future employment opportunities."

The Court instead believes that the rationale underlying its decision in Nurriddin, as well as the Ninth Circuit's opinion in Strother, presents a more accurate picture of the type of "adverse consequences" to which the D.C. Circuit was referring in Brody.  What those cases establish is that to be adverse, the denial of a travel or training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment.  See Nurriddin, 382 F. Supp. 2d at 102 ("It is not enough for plaintiff to say that because of the denial of travel his general stature at [work] has suffered.").  Where, as in the Ninth Circuit's example, an employee is denied permission to attend a seminar and then denied a raise for failing to have the training that would have been obtained at that seminar, the employee will be able to point to a materially adverse consequence - - to wit, a lost chance for a salary increase.  See Strother, 79 F.3d at 869.  In contrast, where what an employee alleges is that he was denied the chance to pursue, at the employer's expense, potentially fruitful opportunities, he has not pointed to any concrete changes in the terms, conditions, or privileges of his current or identifiable future employment.  Plaintiff, who falls into this latter category, has not suffered an adverse employment action and thus cannot establish a prima facie case of discrimination under Title VII. Accordingly, defendant is entitled to summary judgment on the discrimination claim.

### C.  Retaliation

The bulk of plaintiff's allegations focus on actions that Rebecca Clark and her superiors at EPA supposedly took in retaliation for plaintiff's filing of a second EEO complaint in November 2001.  Plaintiff points to six allegedly retaliatory actions: (1) the erosion in his duties under Clark and her predecessors; (2) the letter of reprimand issued on December 13, 2001; (3) Clark's refusal to promote him to the GS-11 level; (4) his designation as absent without leave (AWOL) in January 2002; (5) the five-day suspension approved in August 2002; and (6) the ten-day suspension imposed in July 2003.  The Court will address each of these actions in turn.

#### 1.  Diminished duties

Plaintiff alleges that, since he filed his first EEO complaint in 1999, his duties at NCER have eroded in that he was asked to manage fewer research grant programs and fewer fellowship students, he was no longer permitted to conduct site visits by himself, and he was stripped of his duties as Tribal Program Coordinator and Special Emphasis Program Manager.  Compl. at 5-6. EPA argues that any reduction in plaintiff's workload did not constitute an adverse employment action and that, even if it did, the Agency had legitimate, nondiscriminatory reasons for decreasing plaintiff's responsibilities.

As an initial matter, the Court rejects EPA's argument that the reduction in work assignments, as alleged, "did not rise to the level of an adverse employment action."  Def.'s Motion at 18.  It is now clear that a significant change in an employee's work assignments is "a classic and widely recognized example of forbidden retaliation."  White, 126 S. Ct. at 2416 (citation and quotation marks omitted); see also Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006).  In the wake of White, this Court has similarly concluded that a plaintiff's allegation

19

that she had been stripped of some of her duties sufficed to establish an adverse employment action in the retaliation context.  Prince v. Rice, - - F. Supp 2d - - , 2006 WL 2802802, at *10 (D.D.C. Sep. 18, 2006).  Evaluated against these precedents, plaintiff's allegation that his workload was reduced and that he was stripped of specific responsibilities suffices to show that he suffered an adverse employment action.

Nonetheless, plaintiff's claim fails for two other independent reasons.  To begin with, plaintiff has not pointed to any causal connection between his protected conduct - - the EEO complaint filed in March of 1999 - - and the adverse employment actions that he claims to have suffered.  Lacking, for example, is the temporal proximity that aggrieved employees (and plaintiff here with respect to other claims) often cite as evidence of causation.  See, e.g., Holcomb, 433 F.3d at 136 (noting that "[a] plaintiff may satisfy this third element of a prima facie case by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'") (citation omitted); Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) (recognizing that "this circuit has held that a close temporal relationship may alone establish the required causal connection").  Plaintiff has not even identified when his supervisors began reducing his workload, and the two significant events that he does date - - the removal from his posts as Tribal Program Coordinator and Special Emphasis Program Manager in July and September 2000 - - took place well over a year after his protected conduct.  Such a substantial passage of time between protected conduct and the allegedly retaliatory acts does not demonstrate a causal connection under controlling law.  See Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam) (citing with approval cases holding that a three or four month delay between the protected activity and the

adverse action did not suffice to show a causal connection, and holding that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all"); Broderick v. Donaldson, 338 F. Supp. 2d 30, 43 (D.D.C. 2004) ("[I]f the time lapse is more than a year, [c]ourts will not infer causation.").

But even if plaintiff could establish the requisite causal connection, his claim would still fail because he has not offered any evidence to rebut the proffered legitimate, nondiscriminatory reasons.  EPA, though not conceding that the actions were in fact adverse, maintains that any reduction in plaintiff's workload and responsibilities was attributable to three interrelated causes. First, management decided to expand the number and types of employees responsible for overseeing research fellows.  Def.'s Motion at 17 (citing Def.'s Exh. 38, ¶¶ 4-5).  Second, the positions of Tribal Program Coordinator and Special Emphasis Program Manager were never designed to be permanent, and plaintiff was rotated out of them in due course.  Def.'s Motion at 18.  Third, with respect only to plaintiff's workload following the 2001 settlement agreement, plaintiff himself told Rebecca Clark during their initial meeting that, while he was willing to do some work, he was reluctant to take on new tasks.  Id. at 17-18; Pl.'s Exh. 8 at 249.  These justifications, EPA submits, satisfy its burden of production under McDonnell Douglas.

Plaintiff's one-paragraph response is unconvincing.  According to plaintiff, the reasons offered by EPA do "not make sense," "raise an inference that [plaintiff] was underutilized," and "suggest that this underutilization began after he initiated EEO activity."  Pl.'s Opp'n at 12. Outside of these conclusory assertions, however, plaintiff has provided no evidence to support his argument that the Agency's proffered reasons are pretextual.  For all these reasons, then, EPA is entitled to summary judgment on this aspect of plaintiff's retaliation claim.

2.  Reprimand letter

The second allegedly retaliatory action identified by plaintiff is the issuance of a letter of reprimand on December 13, 2001.  Compl. at 13-14, ¶ 17.  Defendant disputes that a letter of reprimand, without more, can constitute an adverse employment action, and also provides what it contends are legitimate, nondiscriminatory reasons for issuing the reprimand.  Although the Court ultimately concludes that EPA is entitled to summary judgment on this claim on other grounds, it will, for the sake of completeness, lay out the parties' competing arguments on the adverse-employment-action question.

EPA argues that issuing a letter of reprimand is not an adverse employment action because plaintiff suffered no "material consequence[s]," such as a "diminution in pay, benefits or responsibility."  Def.'s Motion at 13.  Plaintiff acknowledges that district courts in this circuit, including this Court, have consistently held that "[f]ormal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level, job title, duties, benefits or work hours . . . do not constitute adverse actions."  Runkle v. Gonzales, 391 F. Supp. 2d 210, 225 (D.D.C. 2005); see also Brody, 199 F.3d at 458; Coleman v. District of Columbia, Civ.A. No. 04-1325, 2006 WL 2434926, at *4 (D.D.C. Aug. 22, 2006); Henderson v. Rice, 407 F. Supp. 2d 47, 53 (D.D.C. 2005); Broderick, 338 F. Supp. 2d at 42.  This Court reviewed the law in this area in Nurriddin, granting summary judgment for the employer because the employee's allegation that the letter decreased his chances of being promoted was "too speculative to be material."  382 F. Supp. 2d at 94 (citing Broderick, 338 F. Supp. 2d at 42).  Plaintiff responds that, whereas the possibility that the letter would affect the employee's promotion was still speculative in those cases, Clark's explicit reliance on the letter as a ground for denying plaintiff a promotion makes the harm that he suffered tangible and material.  Pl.'s

Opp'n at 16; Def.'s Exh. 40 at 22 (Dec. 19, 2001 Memorandum to Edwards).

The Court need not definitively resolve the question whether a letter of reprimand becomes an adverse employment action when the employer explicitly relies on that letter in denying a promotion. Once again, even if plaintiff satisfies the second and third elements of the prima facie case, he has failed to rebut the legitimate, nondiscriminatory reasons for the reprimand that EPA has provided. EPA's proffered reasons are as straightforward as they come - - plaintiff did not show up for the first day of a mandatory two-day retreat in November 2001, was notified by his supervisor that he was expected to attend the second day, again declined to attend, and responded to his supervisor's questions about his refusal to attend by telling her that, "if you're expecting me to be at a certain place at a certain time, you're going to be disappointed." Def.'s Exh. 24 at 177 (Clark 2002 EEO Interview). Simply put, EPA maintains that plaintiff was disciplined because he openly defied a clear directive from his supervisor.

Plaintiff responds by disputing that attendance at the two-day retreat was in fact obligatory. Pl.'s Opp'n at 16-17. In so doing, plaintiff points out that the flyer distributed via e-mail and posted around the office said "[e]veryone is expected" to attend, rather than that the retreat was "mandatory." Def.'s Exh. 25 (Flyer). He then relies on the testimony of another employee, Nigel Fields, and of NCER Director Preuss as support for the notion that there is a difference between mandatory meetings and meetings that all employees are "expected to attend." This argument defies commonsense and is in any event unsupported by the evidence in the record. Although acknowledging that he had seen the phrase "attendance is mandatory" used on other occasions, Preuss testified unequivocally that the word "mandatory" and the phrase "everyone is expected to attend" were "equivalent" and captured "the same intent." Pl.'s Exh. 3 at

23

41-42.  Even Fields, whose testimony is notably cautious, explained that management used terms like "encouraged to attend" or "expected to attend" when it was placing special emphasis on the importance of particular events.  Pl.'s Exh. 5 at 31.  Fields further testified that, when missing an event that his supervisors had encouraged or expected him to attend, he would contact a supervisor to let her know that he could not make it.  Id. at 34.  Plaintiff made no such contact with Clark.  In short, plaintiff has introduced no evidence that undermines either the mandatory nature of the retreat or the seriousness with which management viewed his purposeful absence.

Plaintiff's remaining arguments are similarly unpersuasive.  He asserts that a jury could infer pretext from the fact that other employees did not attend the two-day retreat but were not issued letters of reprimand.  EPA, however, has never denied that other employees were given permission to miss all or part of the retreat, arguing instead that plaintiff was the only employee to skip the retreat without prior authorization.  See Def.'s Exh. 24 at 177 (Clark 2002 EEO Interview).  In pointing to an incomplete list of employees who he says did not attend the retreat - - full names are given for only three of the five people, one of whom is NCER Director Preuss, see Pl.'s Exh. 8 at 130 - - plaintiff does not respond to the Agency's contention, backed by Clark's statements in 2002, that other absences were authorized by management.

### 3.  Refusal to promote

Plaintiff's next contention is that the denial of his requested promotion to GS-11 was also retaliatory.  EPA again contests plaintiff's ability to establish a prima facie case of retaliation, and offers a legitimate, nondiscriminatory reason in case the Court concludes that the prima facie case has in fact been made.  With respect to the adverse-employment-action element, EPA acknowledges "that failure to promote is an 'adverse action' for purposes of the prima facie case,"

24

Stella, 284 F.3d at 146, but argues that the unique circumstances of this case distinguish it from the standard failure-to-promote setting.  Specifically, EPA emphasizes that Clark considered plaintiff for a promotion in December 2001 only because she was required to do so by the settlement agreement signed in June 2001.  Because plaintiff did not actually apply for a promotion, EPA contends, its refusal to grant him such a promotion should not be deemed adverse.  See Lathram, 336 F.3d at 1089 ("[A]n element of a prima facie case of discriminatory non-promotion is that the plaintiff 'applied for and was denied an available position for which he/she was qualified.'") (quoting Stella, 284 F.3d at 139) (emphasis added in Lathram).  The validity of this argument turns on what it means to "apply" for a promotion.  Plaintiff readily concedes that EPA was obliged by the settlement agreement to consider him for a promotion, and that he sent a memorandum to Clark in November 2001 "reminding her of the upcoming promotional consideration and stating to her that she had not informed him of any deficiencies." Pl.'s Opp'n at 17.  If plaintiff's memorandum is viewed as an application, then EPA's argument fails, and its refusal to promote plaintiff constitutes an adverse action.

What significance, then, should the Court ascribe to the fact that EPA considered plaintiff for a promotion because it knew that it had to do so?  The Court believes that this fact, rather than affecting the adverse-employment-action inquiry, helps to defeat plaintiff's contention that there is a causal connection between his protected activity and the Agency's refusal to promote him.  One of plaintiff's primary arguments is that the "close proximity" between the filing of his second complaint on December 5th and the denial of the promotion on December 17th suffices to establish a causal connection.  That plaintiff should take this tack is not surprising, given the law in this circuit that "a close temporal relationship may alone establish the required causal

connection."  Singletary, 351 F.3d at 525 (emphasis added).  It is at this point, however, that the

obligatory nature of the promotion evaluation becomes particularly important.  Concretely, the

fact that the settlement agreement - - and plaintiff's not-so-subtle reminder of its terms - -

required Clark to act when she did deprives the temporal proximity between the complaint and

the adverse employment action of the importance that it might otherwise have.  The Court

concludes that the asserted temporal proximity is more apparent than real under these

circumstances, such that the twelve days between the protected conduct and the adverse action do

not alone suffice to establish causation.

    But once again, the Court need not make a definitive ruling on this issue because EPA is

entitled to summary judgment even if plaintiff has made out a prima facie case.  The Agency has

presented abundant evidence documenting what it labels plaintiff's "performance inadequacies,"

a series of deficiencies that, it says, objectively explain and justify EPA's refusal to grant plaintiff

a promotion to GS-11.  Def.'s Motion at 14; Def.'s Exh. 40 (December 19, 2001 Memorandum to

Edwards).  An employee's poor job performance is a well-established nondiscriminatory

justification for an adverse employment action.  See, e.g., Waterhouse, 298 F.3d at 993; Nichols

v. Billington, 402 F. Supp. 2d 48, 73 (D.D.C. 2005).  Included in the December 19, 2001

Memorandum addressing plaintiff's concerns are a two-page document prepared by Clark listing

specific examples of plaintiff's performance and behavior problems, a copy of an e-mail from

Levinson to plaintiff in December 2000 in which Levinson told plaintiff to complete a report by

February 2001 (he eventually turned in that report in December 2001), and Dr. Matthew Clark's

e-mail message detailing the inadequate nature of the literature search that plaintiff had

conducted.  Def.'s Exh. 40 at 21-24.  EPA has also put forth a sworn declaration from Levinson,

26

Clark's predecessor, in which she confirms that Clark contacted her to discuss whether plaintiff deserved a promotion and that she told Clark that plaintiff "had not demonstrated the advancement of skills required for a promotion to a GS-11."  Def.'s Exh. 38 at 4, ¶ 18.

In response, plaintiff merely offers a series of excuses for each deficiency identified by Clark.  But as one court of appeals has remarked, "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with [retaliatory] animus."  Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001); see also Fischbach v. D.C. Dep't. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.") (citation and quotation marks omitted) (alterations in original).  When he attacks the wisdom of EPA's reliance on specific deficiencies, therefore, plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [EPA's] reasons that a reasonable factfinder could rationally find them unworthy of credence."  Abramson, 260 F.3d at 283 (citation and quotation marks omitted); see also Vasilevsky v. Reno, 31 F. Supp. 2d 143, 149 (D.D.C. 1998) (explaining that plaintiffs "must do more than just deny or criticize the proffered reasons of the defendant").  Plaintiff has simply failed to make that showing.  Contesting the importance of his tardy completion of a report assigned by Levinson, for example, plaintiff submits that Clark did not "warn him that an incomplete [] STAR report would affect his performance review."  Pl.'s Opp'n at 19.  But a supervisor should not have to tell an employee that completing an assignment some ten months

after it was due might affect the employee's performance review,[3] and Clark's possibly imperfect communication skills do not affect the sincerity of EPA's belief that plaintiff did not deserve a promotion.  See Fischbach, 86 F.3d at 1183.

Plaintiff's final salvo is that EPA's proffered justifications must be pretextual because EPA did not see fit to take "progressive" disciplinary actions against him at the time that each problem arose.  Certainly, "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext," Rudin v. Lincoln Land Community College, 420 F.3d 712, 727 (7th Cir. 2005); but plaintiff has not identified any EPA policy that would have required the Agency to institute disciplinary actions for the particular conduct at issue. Moreover, he has not explained why EPA's lenience in declining to take the drastic step of formal disciplinary action should later serve to bar EPA from even considering the employee's conduct in the distinct context of career advancement.  Such a rule would encourage EPA to err on the side of formal discipline, lest an initial failure to act prevent it from later basing an adverse personnel decision on prior undisciplined misconduct.  It would be passing strange for someone who has objected as vigorously to disciplinary actions as has plaintiff to encourage such a harsh policy.  Because plaintiff has failed to rebut the legitimate, nondiscriminatory reasons for the denial of his promotion, this aspect of his retaliation claim cannot survive summary judgment.

---

[3] Similarly unpersuasive is plaintiff's contention that a reasonable juror could infer pretext from the fact that Dr. Clark provided substantive written criticism of plaintiff's literature search only after plaintiff had challenged the grounds on which his promotion was denied.  See Pl.'s Opp'n at 23-24.  The record contains a straightforward explanation: Dr. Clark provided an evaluation of plaintiff's performance because, in his December 19, 2001 memorandum challenging Rebecca Clark's decision, plaintiff asserted that he had never received a "response" to his work product from Dr. Clark.  Def.'s Exh. 28.  Dr. Clark's e-mail drafted later that day constituted just such a response.  Def.'s Exh. 40 at 24.

### 4.  AWOL designation

The fourth allegedly retaliatory action identified by plaintiff is Clark's decision to declare him "absent without leave," or AWOL, for his absence on January 28, 2001.  EPA does not dispute, though it might have, that being placed on AWOL status constitutes an adverse employment action.  Compare Ware v. Billington, 344 F. Supp. 63, 77 (D.D.C. 2004), with Brown v. Snow, 407 F. Supp. 2d 61, 65 (D.D.C. 2005).  What EPA instead contends is that its legitimate reasons for taking action against plaintiff demonstrate that there was no causal connection and that it has rebutted any inference of retaliatory animus plaintiff has raised.

Plaintiff has introduced no direct evidence that the AWOL designation was prompted by his protected activity, and must consequently "rely on circumstantial evidence of the temporal proximity between his complaint of discrimination and [the adverse action]" in order to establish a causal connection.  See Nurriddin, 382 F. Supp. 2d at 105.  Clark's decision to declare plaintiff AWOL on January 29, 2001 occurred almost two months after she had learned of his protected activity.  As this Court has observed, other judges in this district "have held that the passage of two months may create too wide a temporal chasm to give rise to an inference of causal connection."  Kalinoski v. Gutierrez, 435 F. Supp. 2d 55, 70 (D.D.C. 2006) (citing Baker v. Potter, 294 F.Supp.2d 33, 41 (D.D.C. 2003)).  Seeking to shorten the interval (and thus strengthen the inference of causation), plaintiff submits that temporal proximity should be judged not from Clark's initial meeting with the EEO counselor on December 5, 2001, but instead from her third meeting with the EEO counselor on January 2, 2002.  Plaintiff's argument misapprehends the significance of key events in the complaint process.  The December 5 meeting between Clark and the EEO counselor is important not because that meeting constituted

29

protected activity by plaintiff, but rather because it was at that meeting that Clark learned of plaintiff's protected activity - - his filing of a second EEO complaint.  Plaintiff has not cited any authority, and the Court has found none, that supports the proposition that subsequent steps in an EEO investigation themselves constitute protected activity.  Hence, the appropriate time period stretches from the December 5, 2001 meeting to the AWOL designation of January 29, 2002.

This borderline evidence of temporal proximity, however, remains plaintiff's only evidence of a causal connection.  In a previous case, this Court granted summary judgment in favor of the employer where there was "nothing to support the causal inference between plaintiff's protected activity and adverse employment action other than the closeness of time," and "there [was] evidence that tends to negate a causal connection."  Nurriddin, 382 F. Supp. 2d at 105.  There, the fact that other employees were denied promotions during the same time period and that one of the employees who had been promoted worked in a different division undermined whatever inference could be drawn from the time interval of three to five months.  Id. at 105-06.

The same conclusion follows here.  EPA has introduced competent evidence demonstrating that plaintiff had regularly violated attendance policies and that Clark had personally warned him that further violations could result in an AWOL designation.  See Def.'s Exh. 27 at 243-244 (E-mails from Clark to Plaintiff on November 7 and November 9, 2001).  Plaintiff's two-pronged response - - that he believed the absence policy instituted by Clark violated the collective bargaining agreement (CBA) and that another habitually absent employee was not sanctioned - - is unavailing.  Plaintiff has neither identified how the requirement that ESRD employees contact Clark directly contravened the CBA, nor explained why his disagreement with the policy entitled him to violate it without consequence.  Moreover, the

30

testimony cited by plaintiff simply does not support his argument that another employee, Karen

Hawthorne, had a similar history of infractions and was never sanctioned.  Deputy Director Jack

Puzak, when asked about the frequency of Hawthorne's absences and whether she was ever

suspended for her absenteeism, responded "I don't know."  Pl.'s Exh. 8 at 38 (Puzak Dep.).

Plaintiff has pointed to no other evidence in the record that would bolster his claim that

Hawthorne was similarly situated to him but was treated more favorably.  See Waterhouse, 298

F.3d at 995-96 (holding that where the employee provided no "evidence that the comparators

were actually similarly situated to her," the allegation to that effect "added nothing to [her] claim

that the defendants' explanation for her termination was mere pretext").  Accordingly, the Court

concludes that plaintiff has failed to establish the requisite causal connection to state a prima

facie case of retaliation.

    For the same reasons, the Court also concludes that plaintiff has not successfully rebutted

the nonretaliatory reasons for the AWOL designation that EPA has proffered.  Failure to comply

with an employer's attendance policy constitutes a nonretaliatory ground for an adverse

employment decision.  See Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 709, 711 (7th

Cir. 2002) (holding, in an FMLA-retaliation case, that the employee's failure to comply with the

company attendance policy constituted a legitimate business justification).  As explained above,

plaintiff's arguments in rebuttal would not permit a reasonable juror to find that the proffered

justifications were pretextual and that the AWOL designation was made in retaliation for

plaintiff's earlier protected activity.  Accordingly, even if plaintiff could make out a prima facie

case of retaliation, defendant would still be entitled to summary judgment.

    5.  Five-day suspension

Plaintiff's final two allegations of retaliation center on two suspensions that were imposed in 2002 and 2003.  The first was the five-day suspension imposed for plaintiff's failure to attend large parts of a Quality Assurance Training in March 2002.  EPA concedes that the suspension comprises an adverse action, but argues that there was no causal connection and that plaintiff cannot rebut the nonretaliatory reasons for suspending him.  The Court's analysis with regard to causation from Part I.C.4 supra applies equally to this claim, where the adverse action occurred approximately six months after Clark learned of plaintiff's protected activity.  See Def.'s Exh. 7 (May 28, 2002 Notice of Proposed Suspension); Def.'s Exh. 33 (Aug. 5, 2002 Decision on Proposed Suspension).

But even assuming that plaintiff could establish a causal connection, he has not rebutted the reasons offered by EPA.  Stated succinctly, EPA's justification is that plaintiff was insubordinate in refusing to attend mandatory training sessions and in responding to his supervisor's inquiries with scorn and ridicule.  Def.'s Motion at 16-17.  Insubordination is firmly established as a legitimate reason that satisfies an employer's burden of production under the McDonnell Douglas framework.  See, e.g., Smith v. District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005) (holding, in the retaliation context, that an employer's reasons were legitimate where it "instituted disciplinary actions against [the employee] in response to her negligence and insubordination (including discourteous treatment of her supervisor)"); Nichols v. Billington, 402 F. Supp. 2d 48, 73 (D.D.C. 2005) (holding that the employee's "persistently uncooperative attitude, insubordination, and misconduct" constituted a legitimate, nondiscriminatory reason for a proposed suspension); Phillips v. Holladay Property Servs., Inc., 937 F. Supp. 32, 35 (D.D.C. 1996) (finding that the employer had articulated a legitimate reason "by asserting that Plaintiff

32

was terminated for insubordination").  According to EPA, plaintiff was suspended because he intentionally declined to attend large segments of a three-day training program that his supervisors had told him was mandatory.  Because plaintiff had previously been disciplined for attendance problems, and because he answered Clark's questions about his behavior with vituperative responses, a more serious sanction was warranted.[4]

EPA having met its burden of production, plaintiff must now show that the asserted business justification is a pretext for allegedly retaliatory actions.  See Reeves, 530 U.S. at 143. Plaintiff's attempts at rebuttal miss the mark.  First, as he did in challenging the denial of a promotion, plaintiff attacks the wisdom of requiring him to attend the training seminars.  Pl.'s Opp'n at 29.  This is a position that plaintiff has maintained since Clark first questioned his absence from the mandatory training - - an inquiry to which he responded by telling her: "As an EXPERIENCED P[roject] O[fficer], I deemed yesterday's INTRO course less pressing than getting my current awards into the system."  Def.'s Exh. 30 at 290 (Plaintiff's March 13, 2002 E-mail to Clark).  But whether or not plaintiff's assessment of the scheduled training is correct, he has produced no evidence suggesting that the training was anything but mandatory or that other similarly situated employees unilaterally decided not to attend.  Indeed, his repeated references to the testimony of NCER Director Preuss - - who stated that, to the best of his knowledge, no other employee had been disciplined for missing a training session - - are especially mystifying because Preuss also testified that he was unaware of any other employees who had missed the

_____

[4] EPA's proffered reasons are fully supported by the documentary evidence in the record, which includes the lists of employees who were "required" to attend the particular seminars. Def.'s Exh. 30 at 277.  Those lists featured plaintiff's name.  Id. at 276-79.  In addition, what the Agency describes as plaintiff's "insolence," Def.'s Motion at 16, is readily apparent from the e-mail correspondence reproduced in the same exhibit.  See id. at 290-94.

mandatory training.  Pl.'s Exh. 3 at 50 (Preuss Dep.).  No reasonable juror could infer from

plaintiff's subjective belief that the mandatory training seminar was unimportant that EPA was in

reality retaliating against him for having filed an EEO complaint many months earlier.

6.  Ten-day suspension

The Court's analysis of the 2003 ten-day suspension is virtually identical - - the only

questions are whether plaintiff has established a causal connection and whether he has rebutted

EPA's legitimate, nonretalitory reasons for suspending him.  Once again, in trying to prove a

causal connection, plaintiff seeks to shorten the applicable interval by pointing to a later meeting

between Clark and the EEO counselor.  The Court has already rejected plaintiff's attempt in a

different context, see Part I.C.4 supra, and can do so here on even simpler grounds: plaintiff has

his dates wrong.  Clark's third meeting with the EEO counselor took place on January 3, 2002,

not January 3, 2003, as plaintiff asserts.  Pl.'s Opp'n at 32.  Hence, when plaintiff resumed

working under Clark in January 2003, more than a year had passed since he filed his second EEO

complaint.[5]  Cf. Broderick, 338 F. Supp. 2d at 38 (noting that courts "seldom have accepted time

lapses outside of a year in length" as sufficient temporal proximity) (citation and quotation marks

omitted).  Plaintiff has therefore failed to make even the modest showing required to establish a

causal connection at the prima facie stage.

Moreover, EPA is entitled to summary judgment even if plaintiff has satisfied the

elements of a prima facie case.  EPA argues - - and points to undisputed record evidence that

_____

[5] Plaintiff attributes significance to two other EEO-related events in that time period - - the issuance of the investigative report on his second complaint on February 14, 2003, and his request for a hearing before an Administrative Law Judge on March 11, 2003.  Pl.'s Opp'n at 33. Both of these events, however, postdate plaintiff's meeting with Clark in early 2003, the one at which, according to plaintiff, Clark singled him out by imposing the weekly-report requirement.

shows - - that plaintiff refused to comply with Clark's request that he provide weekly reports of his activities.  Plaintiff maintains that the credibility of EPA's justification is undermined by his own statements (1) that none of his other supervisors had previously asked him to produce such reports, and (2) that he did not recall Clark having asked other employees to do the same.  Pl.'s Opp'n at 35; Def.'s Exh. 17 at 270.  This argument fails for reasons already discussed - - plaintiff's subjective view on the wisdom of the requirement does not change the undisputed fact that there was such a requirement and that he refused to comply with it.

Plaintiff's final contention is that a reasonable juror could infer pretext from conflicting testimony as to whether Clark ever told plaintiff that everyone in the division was required to provide weekly reports.  Pl.'s Opp'n at 35.  But this alleged conflict, assuming there is one, is immaterial to the dispositive issue, which is the legitimacy of EPA's proffered reasons for issuing the suspension.  Plaintiff focuses instead on Clark's motivation for imposing the report requirement in the first place.  Even if Clark did so out of distrust toward plaintiff, however, the fact remains that plaintiff openly disobeyed a straightforward request from a supervisor and he has offered no evidence to show that the ten-day suspension was anything but EPA's direct response to that obvious insubordination.  See Santa Cruz v. Snow, 402 F. Supp. 2d 113, 125 (D.D.C. 2005) ("[A]n employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as racial or other discriminatory distinctions do not influence the decision.") (citation and quotation marks omitted).  Plaintiff has offered no evidence from which a reasonable jury could infer that EPA's proffered reasons were pretextual.

### D.  Hostile work environment

Plaintiff's claim that he was subjected to a hostile work environment in retaliation for his

EEO activities likewise merits little discussion.  In essence, this claim attempts to recast the

series of allegedly retaliatory acts discussed above as an oppressive work atmosphere permeated

by unlawful animus.  This Court faced a similar "retaliation-based hostile work environment"

claim in Keeley v. Small, 391 F. Supp. 2d 30, 50-51 (D.D.C. 2005).  The employee in Keeley,

like plaintiff here, "reiterated the grounds for his discrete retaliation claims," and also made

allegations that "he was subjected to a barrage of personal insults by his supervisors and

co-workers."  Id. at 50.  This Court concluded that the plaintiff could not "meet the burden of

showing hostility in the work environment . . . that was 'severe,' 'pervasive,' and 'abusive,'" and

that the occasional verbal insults that plaintiff allegedly suffered "f[e]ll well short of actionable

harassment under a hostile work environment assessment."  Id. at 51.  Further, the Court refused

to permit the plaintiff to "bootstrap" the same series of incidents alleged as retaliation "into a

broader hostile work environment claim."  Id. (citing Lester v. Natsios, 290 F. Supp. 2d 11, 33

(D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in

kind from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult.")).

The same conclusion follows here.  Indeed, plaintiff's allegations are even weaker than

those found insufficient in Keeley.  Whereas the plaintiff in Keeley went beyond reasserting his

retaliation claims by pointing to a few verbal insults and mentions of his protected activity,

plaintiff here has not identified any instances in which he was subjected to verbal harassment.

The sole occasion on which Clark allegedly raised her voice was when she supposedly "lost her

temper" after plaintiff's absence on January 28, 2002 and threatened to suspend him.  Pl.'s Opp'n

at 50.  And plaintiff's only evidence that Clark even did this is a report that plaintiff heard from

36

an unidentified third party.  See Pl.'s Exh. 8 at 156.  While plaintiff may feel that Clark's alleged

outburst violated his "right to privacy," id., any indirect harm that he suffered was not

"sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive

working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998)

(citation omitted).

Plaintiff does add one factor to the mix.  He alleges that Clark attempted to sabotage his

career, first by adding negative comments to a rating of his performance in 2002 and later by

"forward[ing] Edwards' disciplinary records to a prospective employer."  Pl.'s Opp'n at 52;

Compl. at 24.  Plaintiff is correct that an employer's effort to sabotage the employment prospects

of a current or former employee may constitute unlawful retaliation under Title VII.  See Passer

v. American Chemical Soc., 935 F.2d 322, 332 (D.C. Cir. 1991).  But in attributing heightened

significance to EPA's alleged actions, plaintiff again confuses discrete retaliatory acts with a

hostile work environment.  EPA's decision to forward plaintiff's disciplinary records to a

potential employer does not by itself transform a lawful (albeit less-than-ideal) work atmosphere

into an impermissibly hostile one.  Cf. Hussain v. Nicholson, 453 F.3d 359, 366 (D.C. Cir. 2006)

(explaining that "[a]lthough the work environment described by [the plaintiff] was hardly ideal,

. . . no reasonable jury could find it 'abusive' under the standard set forth" by the Supreme Court).

Accordingly, the Court concludes that "plaintiff's reliance on discrete acts that are neither severe

and pervasive nor . . . [retaliatory] falls short of the showing [he] must make to state a viable

hostile work environment claim."  Lester, 290 F. Supp. 2d at 33.

### E.  Concluding remarks

Having analyzed each of plaintiff's Title VII claims, the Court believes that some brief

concluding marks are in order.  Plaintiff's allegations amply demonstrate that he had a strained

and often contentious working relationship with his supervisor.  He acknowledged as much in a

memorandum sent to NCER Director Preuss in June 2002, describing "the overarching issue

between [him] and Clark" as "a personality conflict" attributable to their "different cultural

backgrounds and experiences."  Def.'s Exh. 32 at 275 (June 3, 2002 Response by Plaintiff).  The

allegations, when construed in the light most favorable to him, also show that plaintiff suffered

what he viewed as unjustified professional setbacks.  What plaintiff has not come close to

showing, however, is that any of the actions taken or decisions made by his employer were

motivated by unlawful race-based animus or by his protected conduct, or that those actions

subjected him to a hostile work environment.  Hence, no reasonable juror could find that

defendant violated plaintiff's rights under Title VII, EPA is entitled to prevail as a matter of law,

and summary judgment will be entered in its favor on all of plaintiff's Title VII claims.

## II.  Rehabilitation Act

Plaintiff's one-count complaint also alleges that EPA discriminated against him on the

basis of his disability in two ways: (1) by denying his request to bring his then ten-week-old dog

to the office with him, and (2) by revoking his informal arrangement for occasionally working

from home.  The Court will address these allegations in turn.

### A.  Refusal to approve plaintiff's request to bring his dog to work

"To establish a prima facie case of discrimination under the Rehabilitation Act for failure

to accommodate, a plaintiff must show (1) that [he] was an individual who had a disability within

the meaning of the statute; (2) that the employer had notice of his disability; (3) that with

reasonable accommodation [he] could perform the essential functions of the position; and (4) that

38

the employer refused to make such accommodations."  Thompson v. Rice, 422 F. Supp. 2d 158,

165-66 (D.D.C. 2006) (citations and quotation marks omitted).  Regulations drafted to determine

an employer's liability under the Americans with Disabilities Act ("ADA") likewise govern

liability determinations in employment-discrimination suits under the Rehabilitation Act.  See id.

at 165 n.5 (citing 29 C.F.R. § 1614.203(b)).  EPA does not dispute that plaintiff qualifies as an

individual with a disability or that it had notice of his disability.  Nor does it deny that it refused

to make the accommodation that plaintiff had requested.  What EPA does contest - - and

emphatically so - - is that the accommodation sought by plaintiff was in fact "reasonable."

EPA's argument in this regard has three components.  It first maintains that denying

plaintiff permission to bring his dog to the office did not "intefere[] with [p]laintiff's ability to

perform his job."  Def.'s Motion at 22.  According to EPA, "such interference is an implicit part

of the 'denied reasonable accommodation' calculus" because if a requested accommodation

would not make a difference for the disabled individual, "an employer's failure to provide [it]

would not be meaningful."  Id.  Second, EPA contends that, even if refusing to allow plaintiff's

dog at the office did affect his work performance, plaintiff has not shown that such an

accommodation would have been reasonable.  Finally, EPA argues that the requested

accommodation would have placed an "undue burden upon the Agency."  Id.

EPA's arguments implicate two separate showings - - that a requested accommodation

was reasonable, and that the accommodation would constitute an undue hardship for the

employer.  Under the law of this circuit, plaintiff bears the burden of establishing the former by a

preponderance of the evidence.  See Barth v. Gelb, 2 F.3d 1190, 1186 (D.C. Cir. 1993); Aka v.

Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc) (applying Barth's

analysis under the Rehabilitation Act to the Americans with Disabilities Act).[6]  "A reasonable

accommodation," as the D.C. Circuit has defined it, "is one employing a <u>method of</u>

<u>accommodation</u> that is reasonable in the run of cases . . . ."  <u>Barth</u>, 2 F.3d at 1187; <u>see also</u> <u>Reed</u>

<u>v. LePage Bakeries, Inc.</u>, 244 F.3d 254, 259 (1st Cir. 2001) ("In order to prove 'reasonable

accommodation,' a plaintiff needs to show not only that the proposed accommodation would

enable her to perform the essential functions of her job, but also that, at least on the face of

things, it is feasible for the employer under the circumstances.").  If plaintiff carries his burden of

proving that the requested accommodation was reasonable, then EPA may invoke the affirmative

defense that granting the employee's request would have caused it an undue hardship, but would

bear "the burden of proving the undue hardship" under the governing regulations.  <u>Barth</u>, 2 F.3d

at 1187 (citing 29 C.F.R. § 1613.704(c)(1992)).  Although "[w]hether a proposed

accommodation is reasonable and whether it imposes undue hardship are separate inquiries," the

D.C. Circuit recently acknowledged that "the analyses often overlap, especially when evaluating

as-applied claims of reasonableness."  <u>Taylor v. Rice</u>, 451 F.3d 898, 908 (D.C. Cir. 2006)

(citations omitted).  "This is because an employer's undue hardship claim depends on 'the

particular circumstances' of the case, just as an employee's claim of as applied reasonableness

turns 'on the particular facts' of the case."  <u>Id.</u> (quoting <u>US Airways, Inc. v. Barnett</u>, 535 U.S. 391,

402, 405 (2002)).  Here, the Court agrees with EPA that plaintiff's requested accommodation was

not reasonable and therefore has no need to consider the undue-hardship defense.

_____

    [6] Although both parties cite to <u>Mustafa v. Clark County Sch. Dist.</u>, 157 F.3d 1169, 1176
(9th Cir. 1998) (per curiam), as setting forth the applicable burdens, <u>see</u> Def.'s Motion at 21-22;
Pl.'s Opp'n at 40, this Court is of course bound by the D.C. Circuit's interpretation of the
Rehabilitation Act in <u>Barth</u>.

EPA's central argument is that plaintiff has failed to show (1) that he needed the novel accommodation that he sought and (2) that the requested accommodation would actually have improved his ability to perform his job.  As a consequence, EPA maintains, plaintiff's requested accommodation was not a reasonable one.  See Aka, 156 F.3d at 1305 ("An employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation.") (quoting Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir.1996)); Goodman v. Potter, 412 F. Supp. 2d 11, 17 (D.D.C. 2005); cf. Reed, 244 F.3d at 259 (noting that the employee "must show that [the requested accommodation] would effectively enable her to perform her job").  The Court construes EPA's argument as challenging the reasonableness of the request on two interrelated grounds: necessity and efficacy.

EPA's contention that plaintiff did not actually need the dog in order to perform his duties has a strong factual basis in the record.  Most revealing is the statement that plaintiff made to EEO counselor Patricia Wade soon after filing his second EEO complaint.  Wade said that she asked plaintiff "if he could perform the duties of his job without the dog," and that plaintiff responded that "he had a very easy job and could perform his duties without the dog, but he felt he could do a better job with the dog."  Def.'s Exh. 25 at 67.  Indeed, even while advocating use of the "holistic and experimental approach" represented by the dog, plaintiff's doctor, Kevin Geraci, specifically stated that "[t]he need for the dog [was] beyond the realm of [his] discussion here."  Def.'s Exh. 15 (emphasis added).  In sum, plaintiff did not present to EPA, or to this Court, any objective evidence that bringing his young puppy to the office would have ameliorated his stress and thus allowed him better to perform the duties of his job.

EPA's necessity argument, however, is not as strongly supported by either the text of the

statute and accompanying regulations or the case law in this area.  EPA appears to recognize as much when it argues that a "clear nexus" between an employee's performance difficulties and the requested accommodation is an "implicit part" of the reasonableness inquiry.  Def.'s Motion at 22 & n.7.  This Court recently explored the role of necessity and the existence of a "nexus" requirement in a slightly different context.  See Long v. Howard Univ., 439 F. Supp. 2d 68, 77-78 (D.D.C. 2006).  In Long, the principal issue was whether a university violated Title III of the ADA and section 504 of the Rehabilitation Act when it refused to modify the requirements of its doctoral program to permit a disabled degree candidate to return with no penalty for time missed due to illness.  The university argued, among other things, that the plaintiffs had "failed to establish that any of the requested modifications are reasonable as a matter of law because they ha[d] failed to demonstrate that Long's disability (which limits his ability to walk and breathe) necessitated any modification at all to Howard's academic policies."  Id. at 77.  This Court accepted the basic thrust of the university's argument, which it construed "as calling into question the sufficiency of the correlation" - - later described as a "causal connection" or a "causal link" - - "between Long's disability and the requested accommodations."  Id.

In adopting that position, the Court was dealing with a provision of the ADA that explicitly made necessity a part of the reasonableness inquiry.  The provision of Title III at issue defines actionable disability discrimination as the "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).  Under that plain language, then, a refusal to adopt proposed modifications constitutes unlawful discrimination only if those "modifications

are necessary" to provide the disabled person the desired "goods, services, facilities, privileges, advantages, or accommodations."  See id.  Hence, this Court's reasoning in Long was based on the statutory text that unquestionably governed the inquiry into the reasonableness of the plaintiffs' suggested modifications.

But this specific statutory text, applied in Long to an entity covered by both Title III of the ADA and § 504 of the Rehabilitation Act, does not apply to plaintiff's claim here.  Rather, because plaintiff is a federal employee, the exclusive statutory basis for suit lies in § 501 of the Rehabilitation Act.  See Taylor v. Small, 350 F.3d 1286, 1291 (D.C. Cir. 2003).  And unlike in Long, neither the statutory text of § 501 (which speaks in general terms) nor the more specific regulations limit a federal employer's liability for failing to provide the requested accommodation to situations in which the accommodation was "necessary" to allow the employee to perform the essential functions of his or her position.  See 29 C.F.R. § 1630.2(o)(1)(ii) (defining a reasonable accommodation as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position").[7] Absent a firm basis in the text of the statute or the governing regulations, the Court is reluctant to conclude that an insufficient causal link - - or, put differently, insufficient proof that the

---

[7] The regulation defining those protected by the ADA and the Rehabilitation Act provides an additional reason for the Court to proceed with caution.  As the D.C. Circuit has explained, "an individual with handicaps is 'qualified'" for purposes of the statute "if she can perform the essential functions of her position with reasonable accommodation.  If she can perform these functions without reasonable accommodation, so much the better - - she is, of course, still qualified."  Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994) (citing 29 C.F.R. § 1614.203(a)(6) (1992)).  Hence, the fact that plaintiff could do his job without any accommodation does not in and of itself disqualify him from ever requesting or receiving an accommodation.

requested accommodation was "necessary" - - constitutes an independent basis for rejecting an employee's request for a reasonable accommodation under § 501 of the Rehabilitation Act.

Whether the requested accommodation would be an <u>effective</u> means of responding to plaintiff's disability, in contrast, is a concept addressed by both the EEOC regulations and the case law.  The three explanations of the term "reasonable accommodation" found at 29 C.F.R. § 1630.2(o) limit that term to those "[m]odifications or adjustments" that "enable" a disabled employee to be considered for another position, "to perform the essential functions of" his or her current or desired position, or "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  Hence, employers must make changes to their policies or practices so as to place disabled employees on the same footing as nondisabled ones.  Changes that are not effective do not qualify as "reasonable accommodations."  <u>See</u> <u>Barnett</u>, 535 U.S. at 400-401 (explaining that, although "[t]he regulations do not say that 'enable' and 'reasonable' mean the same thing," the phrase reasonable accommodation "conveys the need for effectiveness [because a]n ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations"); <u>Oconomowoc</u> <u>Residential Programs, Inc. v. City of Milwaukee</u>, 300 F.3d 775, 784 (7th Cir. 2002) ("An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it."); <u>Reed</u>, 244 F.3d at 259 (agreeing with the EEOC "that proving an accommodation's effectiveness is part of the plaintiff's burden").

Plaintiff has not presented objective evidence that bringing his untrained dog to work would have been an effective means of resolving his stress.  Plaintiff relies exclusively on Dr. Geraci's letter as "medical documentation" supporting the efficacy of his proposed

44

accommodation.  As was explained above, however, Dr. Geraci expressly disclaimed his ability

to predict whether the dog would actually solve the problems of which plaintiff had complained.

His closing words - - "I would say 'go for it!'  It certainly cannot hurt" - - are anything but a

ringing endorsement of the dog's effectiveness as a remedy.  Those words, along with the

accompanying reference to plaintiff's plan as "a holistic and experimental approach," signal only

that Dr. Geraci was willing to support nontraditional means of addressing plaintiff's condition.

Outside of Dr. Geraci's letter and his own assertions, plaintiff has not presented evidence that

bringing his puppy to work would have been an effective means of responding to his disability.

Accordingly, the Court concludes that plaintiff has failed to carry his burden of showing that the

proposed accommodation was a reasonable one.  See Reed, 244 F.3d at 259.

This conclusion is consistent with the limited case law presenting similar facts, some of

which was decided under the analogous reasonable-accommodation provision of the Fair

Housing Act ("FHA").  See Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995); Prindable v.

Ass'n of Apt. Owners, 304 F. Supp. 2d 1245, 1256-57 (D. Hawai'i 2003), aff'd sub nom. DuBois

v. Ass'n of Apt. Owners of 2987 Kalakaua, 453 F.3d 1175 (9th Cir. 2006); Schultz v.

Alticor/Amway Corp., 177 F. Supp. 2d 674, 678 (W.D. Mich. 2001); see also Oconomowoc

Residential Programs, 300 F.3d at 783 (noting that "[t]he requirements for reasonable

accommodation under the ADA [and Rehabilitation Act] are the same as those under the [FHA],"

and citing cases).  These cases recognize that both the employee's need for a dog and the

effectiveness of the dog in resolving disability-based problems are valid factors for a court to

consider in deciding whether the employee's requested accommodation was reasonable under the

circumstances.  See Bronk, 54 F.3d at 429 (reasoning that if the dog "was not necessary as a

45

hearing dog, then his presence in the townhouse was not necessarily a reasonable accommodation"); Prindable, 304 F. Supp. 2d at 1256 (granting summary judgment in part because the plaintiff had not produced evidence that the dog was trained as a service animal); Schultz, 177 F. Supp. 2d at 678 (concluding that the employee had "failed to make out an adequate claim for denial of reasonable accommodation because his service dog is not necessary in carrying out the essential functions of his job").  Likewise, plaintiff has not provided evidence (beyond his own statements) to support his need for the dog or to back up his assertion that the dog would have ameliorated his two disability-based ailments - - stress and difficulty walking.

Finally, the Court finds noteworthy - - though not surprising - - the lack of authority holding that an employee is entitled to bring an untrained dog to work as a reasonable accommodation for stress caused by his or her disabilities.  The absence of such authority likely stems from the disconnect between bringing a dog to work and stress-related discomfort, and also from the consequences that would flow from requiring employers to grant such accommodations. The Court does not, however, intend to demean the value of canine companionship.  Indeed, the Prindable court recognized that it "may well be true" that dogs "possess the ability to give unconditional love, which simply makes people feel better."  304 F. Supp. 2d at 1257 n.25.  But as that court also convincingly explained, this line of reasoning

> permits no identifiable stopping point: every person with a handicap or illness that caused or brought about feelings of depression, anxiety or low self esteem would be entitled to the dog of their choice, without regard to individual training or ability.  And if certain people liked cats, fish, reptiles or birds better than dogs, there would be no logical reason to deny an accommodation for these animals.

Id.  The Court agrees with this analysis, and consequently declines to break new ground and start down the slippery slope implicated by plaintiff's claim.

**B.  Revocation of plaintiff's informal work-from-home arrangement**

Plaintiff also alleges that EPA failed to accommodate his disability by revoking the

informal arrangement by which previous supervisors allowed him occasionally to work from

home.[8]  Without conceding that such an arrangement actually existed, EPA maintains that Clark

offered plaintiff the option of seeking permission to work from home under EPA's official

Flexiplace program - - an option plaintiff never exercised.  Hence, EPA contends, there was

neither a proper request for accommodation nor the denial of such a request.

Although plaintiff strains mightily to cast this case as one in which a previously granted

accommodation has been revoked, the Court agrees with EPA that the dispositive issue is

whether he requested and was denied an accommodation.  "An underlying assumption of any

reasonable accommodation claim is that the plaintiff-employee has requested an accommodation

which the defendant-employer has denied."  Flemming v. Howard Univ., 198 F.3d 857, 861

(D.C. Cir. 1999).  Plaintiff acknowledges these two prerequisites to a reasonable accommodation

claim, but emphasizes that the employee's "request for accommodation does not have to be

formal, and the words 'reasonable accommodation' do not have to be used . . . ."  Thompson, 422

F. Supp. 2d at 176 (citation and quotation marks omitted).  In plaintiff's view, the only request

necessary was the one that he made orally to David Kleffman, his first supervisor.  He thus

argues that, from that moment, EPA should be presumed to know of both his disability and his

work-from-home arrangement, and any decision to withdraw the permission allegedly given by

Kleffman constitutes an impermissible revocation of the accommodation.

---

[8] Although plaintiff's Complaint describes this decision as retaliatory in nature, see
Compl. at 11, his opposition to EPA's motion recharacterizes his claim as alleging that EPA
refused to accommodate his disability.  Pl.'s Opp'n at 35, 39.

But plaintiff's theory fails on factual, legal, and policy grounds.  As for the facts, plaintiff testified that his "request" for an accommodation from Kleffman was a "conversation" that led to an "agreement" - - a "verbal understanding" between the two men.  Pl.'s Exh. 8 at 135, 138 (Edwards 2006 Depo.).  The closest that he came to broaching the issue with Clark occurred when he called her from home when he was not feeling well and asked if he could work from home that day.  Def.'s Exh. 32 at 174.  Clark authorized plaintiff to work from home that day, but told him that if he wanted to do so in the future, he would have to submit the documentation required under EPA's Flexiplace policy.  Id.  That policy requires employees who want "to work at a place other than the regularly assigned work site such as satellite locations or their residences" to complete an application "and obtain the appropriate approval signatures."  Def.'s Exh. 41 at 1,11.  Plaintiff acknowledges that he never did so.  Pl.'s Stmt. at 10-11, ¶ 24.  The evidence thus demonstrates that plaintiff did not file a request for an accommodation in accordance with EPA's procedures, which EPA thus never had a chance to grant or deny.

Plaintiff's failure to file a proper request dooms his claim under Flemming, 198 F.3d at 861, unless employers are barred by statute or regulation from requiring disabled employees seeking accommodations to comply with a fixed set of procedures.  But plaintiff has not identified any such authority, and the Court has found none.  The regulations appear to contemplate a regime in which the "process of determining the appropriate reasonable accommodation" commences when "a qualified individual with a disability has requested provision of a reasonable accommodation."  29 C.F.R. Pt. 1630, App.  This is also the view of other federal courts, which have referred to Flexiplace policies and similar programs without so much as hinting that those policies and programs contravened the Rehabilitation Act, the ADA,

or other legislation that requires employers to accommodate their employees' disabilities.  <u>See</u> <u>e.g.</u>, <u>Coleman-Adebayo v. Leavitt</u>, 326 F. Supp. 2d 132, 139-44 (D.D.C. 2004) (granting summary judgment in favor of the employer because the employee failed to show that a Flexiplace schedule would have been "a reasonable accommodation responsive" to her disabilities); <u>Miller v. Danzig</u>, Civ.A. No. 00-422, 2001 WL 34780350, at *5 (E.D. Va. June 22, 2001) (entering judgment for employer where the disabled employee failed to apply for permission to work from home under the company's Flexiplace policy, and reasoning that "[i]t is unreasonable to expect [an employer] to place [an employee] in a program for which she never applied"), <u>aff'd</u>, 22 F. App'x 358 (4th Cir. 2002).  So, too, EPA could not reasonably have been expected to authorize plaintiff to work from home solely on the basis of his unverifiable assurances and without the medical documentation and approval forms that other employees were required to submit.[9]

The conclusion that an employee's oral request cannot trump an employer's established procedure for requesting and approving disability accommodations is supported by practical and persuasive policy justifications.  Accepting plaintiff's view would call into question both the utility and the validity of Flexiplace policies.  If a disabled employee could circumvent those procedures simply by making an unverifiable oral request for the same accommodation, then the

---

[9] Plaintiff's repeated contention that Clark did not require another employee, Sheila Rosenthal, "to fill out paperwork to perpetuate her pre-existing Flexiplace" does not affect the Court's analysis or conclusion on this point for two reasons.  Pl.'s Opp'n at 46.  First, plaintiff's contention rests upon a mischaracterization of Clark's testimony, which plainly demonstrates that Clark did not recall the details of Rosenthal's arrangement.  Pl.'s Exh. 1 at 206-210 (Clark Depo.).  Second, the possibility that the application requirement was relaxed for another employee might show that plaintiff was singled out, but it does <u>not</u> show that plaintiff took the step that serves as a prerequisite to a reasonable accommodation claim: filing a request.

employer would have no way of knowing which employees were working at home with proper

authorization and which ones were simply absent.  A one-time decision by an individual

supervisor would effectively bind an employer that normally prefers for such decisions to be

made as part of a centralized process.  Hence, EPA is entitled to summary judgment on this claim

on the ground that plaintiff never requested an accommodation that was denied.  See Flemming,

198 F.3d at 681.


## CONCLUSION

For the foregoing reasons, EPA's motion for summary judgment is granted.  A separate

order has been posted on this date.


  /s/    John D. Bates
JOHN D. BATES
United States District Judge

Dated: October 18, 2006